**United States District Court**
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT
6         NORTHERN DISTRICT OF CALIFORNIA
7
8  JULIO CESAR IBANEZ,                    No. C 09-4576 MHP (pr)
9          Plaintiff,                     **ORDER GRANTING DEFENDANTS'
                                          MOTION FOR SUMMARY
10  v.                                    JUDGMENT AND DISMISSING
                                          UNSERVED DEFENDANTS**
11  M.L. MILLER; et al.,
12          Respondent.
   _____/
13
14                      **INTRODUCTION**

15          Julio Cesar Ibanez filed this <u>pro se</u> prisoner's civil rights action under 42 U.S.C. §

16  1983.  This case is now before the court for consideration of defendants' motion for summary

17  judgment.  For the reasons discussed below, summary judgment will be granted for the three

18  moving defendants and the two unserved defendants will be dismissed.

19                      **BACKGROUND**

20          This case concerns prison officials' response to Ibanez's expressed safety concerns in

21  the months leading up to an incident that took place at High Desert State Prison when Ibanez

22  was attacked by two inmates on the general population yard.  The following facts are

23  undisputed unless otherwise noted.

24          Ibanez was incarcerated at Pelican Bay State Prison ("Pelican Bay") for just over a

25  year between February 2, 2005 and March 22, 2006.  He then was transferred to High Desert

26  State Prison.

27          Moving defendants Jacquez, Foss, and Douglass were employed at Pelican Bay while

28  Ibanez was an inmate there.  Defendants Miller and Bruce also were employed at Pelican

   Bay, but they have not been served with process and have not appeared in this action.

On May 24, 2005, Ibanez told an unidentified correctional officer at Pelican Bay that he was concerned for his safety and needed protective custody.  (Ibanez provides no clear explanation of what exactly he said was his particular safety concern, but it is undisputed that he did express some concern that he was in danger from other inmates.)  Ibanez was interviewed that day by sergeant Rice about his safety concerns.  During the interview, Ibanez informed Rice about "in-house information known to him."  Complaint, ¶ 11.  Ibanez told sergeant Rice "where weapons were located, who possessed weapons, who was conducting gang activity, who were possible targets in up-comming (sic) stabbings, etc." Id. Rice used the information to organize a search of Ibanez's housing unit, and later that night told Ibanez that staff had confiscated "numerous weapons and other contraband." Id. at ¶ 15. Sergeant Rice later that day tried to get Ibanez to provide additional information on prison gang associations, but Ibanez did not have more information to provide.  When the second interview ended, Ibanez was placed in administrative segregation ("ad-seg").  The CDC-114D ad-seg unit placement notice form stated that he was being put in ad-seg "based upon [his] self-expressed concerns for [his] personal safety should [he] remain within the General Population."  Papan Decl., Ex. C.  The reason for the decision was listed as "retain pending completion of investigation by Sgt. R. Rice into safety concerns."   Although there is no evidence as to what sergeant Rice did thereafter, lieutenant Miller eventually did investigate the matter.

On or about November 8, 2005, lieutenant Miller interviewed Ibanez regarding his safety concerns, and Ibanez requested placement in the special needs yard ("SNY").  At that interview, Miller asked Ibanez to write an account of what occurred on May 24, 2005, including his interviews with sergeant Rice.  On November 23, 2005, Miller interviewed Ibanez again and then wrote a confidential memorandum for Ibanez's file. He wrote:

> Today I have completed an investigation into the Safety Concerns regarding Ibanez. After a through (sic) review of his Central File and two interviews with him, as well as reviewing his own handwritten documentation as to his safety concerns, I can find no sustainable reason that would justify Ibanez remaining in Administrative Segregation.  None of the information provided by Ibanez proved to be correct nor was it considered confidential.  The information would have been easily obtainable by any inmate that was housed on the General Population Yard.  Ibanez stated that he had given up information to Correctional Sergeant R. Rice regarding numerous weapons

> and information regarding Gang Activities (EME) and that the information he gave had been cooberated (sic) and was being used to validate an inmate by the name of [name redacted] as an EME Associate.  After contacting the IGI Office, it was discovered that they had no information regarding [name redacted] as being an EME Associate nor were they investigating now or in the past, his possible association with the EME. [Name redacted] was recently seen by ICC and assessed a SHU term for his second possession of a weapon RVR, but this had nothing to do with Ibanez or any information he has allegedly given to staff.  The written statement given to me by Ibanez was reviewed thoroughly and nothing in this statement could be used to substantiate his claims that his safety was in danger.  To the contrary, all the information that was obtained leads me to believe that Ibanez was in good standing with the Southern Mexicans.  Based on the information at hand, it is my recommendation that Ibanez be returned to ICC and cleared for return to General Population (A or B).

Opposition To Motion For Summary Judgment, Ex. I at 3.

On November 30, 2005, Ibanez appeared for a periodic review of his ad-seg placement before a committee comprised of defendants Jacquez, Foss, Douglass, and Bruce. See Papan Decl., Ex. D.  The committee noted lieutenant Miller's report of his investigation that concluded that Ibanez was in good standing with the Southern Mexicans and could program on a general population yard, and that Ibanez had not provided any information that demonstrated a threat to his safety.  Id. The committee's memorandum stated:

> S claims a rumor was started that he was an ex-cop and that the rumor has spred (sic) among the I/Ms at PBSP, causing a safety concern for him.  No information exists to substantiate S's claims.  While discussing this case with S, he appeared evasive and disingenuous in his responses.  Committee's concern is that S could be a "sleeper" or a "predator."  Committee notes no valid safety or enemy concerns that would warrant SNY placement.

Id.  The committee memorandum noted that Ibanez's disciplinary history included rule violation reports for breaking a window in his cell in 2004, possession of a weapon in 2003, battery on an inmate with a weapon and serious bodily injury in 1999, and possession of a weapon in 1999.  Id.  The committee also noted that Ibanez had never been a victim on a general population yard, and had not articulated any safety concerns until after he arrived at Pelican Bay.  The committee concluded that, although it could not "verify or corroborate [Ibanez's] claim that he has safety issues at PBSP," a transfer recommendation was appropriate "to give [Ibanez] a fresh start."  Id.  The committee recommended Ibanez for transfer to one of two level IV facilities - the California Correctional Institute in Tehachapi or Salinas Valley State Prison.  Ibanez repeated his preference for placement in an SNY.

1       Although the committee had recommended in November that Ibanez be transferred to

2   CCI-Tehachapi or Salinas Valley, a memorandum was written by another staff member in

3   January stating that those institutions were not available for transfer.  <u>See</u> Papan Decl., Ex. F.

4       On March 22, 2006, Ibanez was transferred to High Desert State Prison.   According

5   to Ibanez, he told the receiving staff that he was an "inactive" inmate and was put in one-man

6   holding cell.  <u>Id.</u>  On March 28, 2006, the High Desert unit classification committee ("UCC")

7   interviewed Ibanez and decided to place Ibanez in the general population.

8       On April 4, 2006, Ibanez was let out of his cell into the general population yard for the

9   first time.  He was attacked by inmates Vito and Barragan with a weapon.  Ibanez states that

10  his attackers were "Southern Mexicans."  Complaint, ¶ 26.  Ibanez sustained 43 stab wounds.

11  <u>Id.</u>  He was treated and put in ad-seg that day.

12  **VENUE AND JURISDICTION**

13      Venue is proper in the Northern District of California because the events or omissions

14  giving rise to the claims occurred in Del Norte County, which is located within the Northern

15  District.  <u>See</u> 28 U.S.C. §§ 84, 1391(b).  This Court has federal question jurisdiction over this

16  action brought under 42 U.S.C. § 1983.  <u>See</u> 28 U.S.C. § 1331.

17  **LEGAL STANDARD FOR SUMMARY JUDGMENT**

18      Summary judgment is proper where the pleadings, discovery and affidavits show that

19  there is "no genuine issue as to any material fact and [that] the moving party is entitled to

20  judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment

21  "against a party who fails to make a showing sufficient to establish the existence of an

22  element essential to that party's case, and on which that party will bear the burden of proof at

23  trial . . . since a complete failure of proof concerning an essential element of the nonmoving

24  party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477

25  U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit

26  under governing law, and a dispute about such a material fact is genuine "if the evidence is

27  such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v.</u>

28  <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (citations omitted).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  See id. at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Ibanez's complaint was signed under penalty of perjury and therefore may be considered in deciding the motion for summary judgment.

**DISCUSSION**

A.     Deliberate Indifference To Safety Claim

The Eighth Amendment requires that prison officials take reasonable measures for the safety of prisoners.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  See id. at 833; Hoptowit v. Ray, 682 F.2d 1237, 1250 (9th Cir. 1982).  A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately

1    indifferent to inmate safety.  See Farmer, 511 U.S. at 834.

2        Neither negligence nor gross negligence constitutes deliberate indifference.  See

3    Farmer, 511 U.S. at  835-36 & n.4; Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A prison

4    official cannot be held liable under the Eighth Amendment for denying an inmate humane

5    conditions of confinement unless the standard for criminal recklessness is met, i.e., the

6    official knows of and disregards an excessive risk to inmate health or safety.  See Farmer,

7    511 U.S. at 837.  The official must both be aware of facts from which the inference could be

8    drawn that a substantial risk of serious harm exists, and he must also draw the inference.  See

9    id.  A prison official need not "believe to a moral certainty that one inmate intends to attack

10   another at a given place at a time certain before that officer is obligated to take steps to

11   prevent such an assault" although he must have more than a "mere suspicion" that an attack

12   will occur.  Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) (citations and internal

13   quotations omitted); see also Farmer, 511 U.S. at 842.

14       The inquiry into causation against these defendants from whom Ibanez seeks damages

15   "must be individualized and focus on the duties and responsibilities of each individual

16   defendant whose acts or omission are alleged to have caused a constitutional deprivation."

17   Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).

18       When plaintiffs, such as the inmates, seek to hold an individual defendant personally
     liable for damages, the causation inquiry between the deliberate indifference and the
19   eighth amendment deprivation must be more refined [than when a plaintiff seeks an
     injunctive or declaratory relief].  We must focus on whether the individual defendant
20   was in a position to take steps to avert the stabbing incident, but failed to do so
     intentionally or with deliberate indifference.  In order to resolve this causation issue,
21   we must take a very individualized approach which accounts for the duties, discretion,
     and means of each defendant. . . . Sweeping conclusory allegations will not suffice to
22   prevent summary judgment. . . . The prisoner must set forth specific facts as to each
     individual defendant's deliberate indifference.

23

24   Id. at 633-34 (citations omitted).

25       The court assumes arguendo that the combined effect of the evidence that Ibanez

26   thought he was in danger from Southern Mexican gang members and the evidence that he

27   was quickly attacked by two Southern Mexican gang members when he was released into the

     general population yard is sufficient to allow a trier of fact to infer that there was an actual
28
     risk of harm to Ibanez from Southern Mexican gang members.[1]  Doing so, however, only

6

takes care of the first of the two prongs of the deliberate indifference test.  On the second prong, Ibanez fails.

The undisputed evidence shows that (1) Ibanez was promptly put in ad-seg when he expressed concerns about his safety; (2) lieutenant Miller investigated Ibanez's reported safety concerns, was unable to verify a danger to Ibanez, and determined that he could be returned to the general population; (3) defendants' committee held a hearing, reviewed Miller's investigation report, expressed concern that Ibanez might be a "sleeper" intent on doing harm if placed in the SNY, and declined to recommend SNY placement; (4) defendants' committee recommended he be transferred to another prison to get a fresh start; and (5) defendants had no further contact with or control over Ibanez's placement.  Viewing the evidence in the light most favorable to Ibanez, no reasonable jury could conclude that the moving defendants knew there was a substantial risk to Ibanez's safety on the general population yard and acted with deliberate indifference to that risk.  This is a case where prison officials are not liable because the undisputed evidence shows that "they responded reasonably" to the reported risk, "even if the harm ultimately was not avoided." Farmer, 511 U.S. at 843-44.

Ibanez argues that defendants should have sent him to the SNY because he fit some of the criteria for such placement mentioned in a February 19, 2002 memorandum that provided guidance to wardens and classification representatives on SNY placement considerations. The memorandum identified inmates with "significant enemy concerns" as among those appropriate for SNY housing; "[i]nmate 'snitches' or informants are appropriately housed on SNY when their activity becomes known on the GP, making widespread, yet not necessarily identified, enemies."  Opposition, Ex. III at 2.  The memorandum recommended taking "a liberal approach to placing an inmate in a SNY." Id. at 3.  However, that same memorandum also cautions against SNY placement for exactly the kind of inmate the committee members thought Ibanez might be: "The primary concern is to ensure "**Sleepers**" or "**Predators**" are not endorsed into the SNY.  This type of inmate is intent on carrying out assaults on SNY inmates and often has a documented affiliation with a prison or street gang." Id. at 1.

1    Defendants had several reasons to <u>not</u> place Ibanez on the SNY.  Miller's investigation had

2    found nothing to verify his claim that he was in danger.  The committee thought Ibanez might

3    be a "sleeper" who would do damage if he gained access to other inmates on the SNY based

4    on his evasive responses at the hearing.  His filings suggest that he used to be affiliated with

5    some street gang.  The possibility of him being a sleeper also would be consistent with his

6    history that included no previous safety concerns, no prior attack on him while housed in the

7    general population, and disciplinary history that included attacking another inmate and

8    possessing weapons.

9        Ibanez argues without evidentiary support that he told Miller that he had been stabbed

10   in the San Diego County Jail in 2003 when he was in the jail's SNY.  His argument cannot

11   defeat summary judgment.[2]  Even if Ibanez had presented evidence that he did tell Miller of

12   the 2003 stabbing and that he was in the SNY at the jail, it is not clear that it would create a

13   triable issue of fact because he does not present evidence that the jail stabbing was a gang-

14   related stabbing, or that any prisoner at Pelican Bay knew about it, or that any of the moving

15   defendants knew about it.  He also fails to note that he had been in the Pelican Bay general

16   population for about nine months (and other prisons for a couple of years) without incident.

17       Ibanez suggests that his mere presence in ad-seg branded him an informant.  That

18   speculation has no evidentiary basis.  One cannot draw a reasonable inference that a

19   prisoner's placement in ad-seg is tantamount to labeling him an informant because inmates

20   are put in ad-seg for so many different reasons.  Among other things, an inmate may be in ad-

21   seg because he is affiliated with a prison gang; because prison officials are investigating a

22   potential danger to the inmate; because prison officials are investigating an alleged danger

23   that inmate poses to other inmates, staff or the institution; and because there are no beds

24   available in general population.  <u>See generally</u> Papan Decl., Ex. C (part A).  The mere fact

25   that he was in ad-seg did not create a danger to him, nor is there a whit of evidence that any

26   defendant understood him to be in danger based on the ad-seg placement.

27       Defendants do not dispute that Ibanez expressed a concern about his safety or that he

28   asked to be put on the SNY but instead contend that there is no evidence they did not respond

1  reasonably to Ibanez's concerns and request.  The court agrees.  There is an absence of

2  evidence from which a reasonable jury could conclude that defendants knew a safety risk

3  existed for Ibanez if he was released to general population and not put in a SNY.   When the

4  evidence is viewed in the light most favorable to Ibanez, and inferences therefrom drawn in

5  his favor, a reasonable jury could not find that defendants were deliberately indifferent to a

6  known risk to Ibanez's safety.  Defendants are entitled to summary judgment in their favor

7  because Ibanez has not established a genuine issue for trial as to whether any of the

8  defendants were deliberately indifferent to a risk to his safety.  See Celotex, 477 U.S. at 324.

9  B.     Qualified Immunity Defense

10        The defense of qualified immunity protects "government officials . . . from liability

11  for civil damages insofar as their conduct does not violate clearly established statutory or

12  constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

13  457 U.S. 800, 818 (1982).  The rule of qualified immunity "'provides ample protection to all

14  but the plainly incompetent or those who knowingly violate the law.'"  Burns v. Reed, 500

15  U.S. 478, 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

16        In determining whether the defendants are entitled to qualified immunity, the usual

17  first step is to answer this threshold question: "Taken in the light most favorable to the party

18  asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

19  right?"  Saucier v. Katz, 533 U.S. 194, 194 (2001).  If no constitutional right was violated if

20  the facts were as alleged, the inquiry would end and the defendants prevail.  As discussed

21  above, the evidence does not raise a triable issue of fact that there was a violation of Ibanez's

22  Eighth Amendment rights.  The inquiry thus ends and defendants prevail on their qualified

23  immunity defense.

24  C.     The Unserved Defendants

25        The court ordered service of process on all five defendants at Pelican Bay, which was

26  the only address provided by plaintiff on his complaint filed almost four years after the acts

27  complained of occurred.  Three of the defendants were served, but two other defendants (i.e.,

28  Miller and Bruce) were not served.  Court staff made inquiries and learned that the unserved

defendants had retired and the prison did not have a forwarding address for either.  Ibanez requested that the court order service of process on the unserved defendants (docket # 19), but provided no new information as to how to find them.   Thus, more than two years after the complaint was filed, nowhere near enough information has been provided to find and serve the unserved defendants: all that is known is that there are two individuals with no first names (only initials) and common last names, who used to be employed at Pelican Bay but are no longer there.  Although the court can and does have the U.S. Marshal serve process on defendants routinely in in forma pauperis cases, it is the plaintiff's responsibility to provide a name and address for each defendant to be served.  See generally Walker v. Sumner, 14 F.3d 1415, 1421-22 (9th Cir. 1994), overruled on other grounds by Sandin v. Conner, 515 U.S. 472, 483-84 (1995) (prisoner failed to show cause why prison official should not be dismissed under Rule 4(m) because prisoner did not prove that he provided Marshal with sufficient information to serve official or that he requested that official be served).  In light of the failure to serve defendants Miller and Bruce within 120 days after the complaint was filed, the action against them is dismissed without prejudice.  See Fed. R. Civ. P. 4(m). Plaintiff may pursue a new action against them if he ever finds them.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 13.).  Judgment will be entered (a) in favor of defendants Jacquez, Foss and Douglass and against plaintiff, and (b) dismissing without prejudice defendants Miller and Bruce.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 10, 2011

_____
Marilyn Hall Patel
United States District Judge

# <u>NOTES</u>

1.      Neither party explained who the "Southern Mexicans" were.  In an order issued in a case Ibanez filed in the Eastern District, the court noted that Ibanez had explained in a deposition that "'Southern Mexicans' are those inmates of Mexican heritage who were in a Southern California street gang prior to incarceration," and are subordinate to the Mexican Mafia prison gang.  <u>See</u> <u>Ibanez v. Miller</u>, E D. Cal. No. CIV-S-06-2668 KJM, Findings and Recommendations at 2 n.1.  This is not an undisputed fact, and is only provided to aid the reader's understanding of the reference to "Southern Mexicans."

2.      The evidentiary deficiency on this point does not appear to be an oversight: Ibanez testified in his deposition in a related case that he did <u>not</u> tell Miller of the stabbing.  <u>See</u> <u>Ibanez v. Miller</u>, E D. Cal. No. CIV-S-06-2668 KJM, Findings and Recommendations at 2 ("Plaintiff states in his undisputed facts that he told Lieutenant Miller of the 2003 stabbing 'prior to the conclusion of his investigation,' citing to his deposition as support. Pl.s  SUF 4.  However, plaintiff testified clearly in his deposition that he did <u>not</u> tell Lieutenant Miller of the 2003 stabbing.  Pl.'s Dep. at 24:23-25:11.")  That deposition is not in the record before this court and therefore the court cannot state that the fact is undisputed.  In other words, the court does not find as an undisputed fact that Ibanez <u>did not</u> tell Miller of the stabbing – but also does not find as an undisputed fact (or even a disputed fact) fact that he <u>did</u> tell Miller of the stabbing.